UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| REFCO INC., et al., | : | Case No. 05-60006 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------------x

| | |
|---|---|
| MARC S. KIRSCHNER, | : |
| As Trustee of the Refco Litigation Trust, | : |
| | : |
| Plaintiff, | : |
| | : |
| - against- | :Adv.Pro.No.07-3060 (RDD) |
| | : |
| JOHN D. AGOGLIA, PHILLIP R. BENNETT, | : |
| THE TRUSTEE(S) OF THE PHILLIP R. | : |
| BENNETT THREE YEAR ANNUITY TRUST, | : |
| EDWIN L. COX, SUKHMEET "MICKEY" | : |
| DHILLON, THE TRUSTEE(S) OF THE JASDEEP | : |
| DHILLON TRUSTEE MSD FAMILY TRUST, | : |
| THOMAS H. DITTMER, THE TRUSTEE(S) OF | : |
| THE DITTMER TRUST, STEPHEN GRADY, | : |
| TONE N. GRANT, ERIC LIPOFF, SANTO | : |
| MAGGIO, PETER McCARTHY, JOSEPH | : |
| MURPHY, FRANK MUTTERER, WILLIAM | : |
| SEXTON, WILLARD SPARKS, ROBERT | : |
| TROSTEN, MEMPHIS HOLDINGS LLC, MLC | : |
| FIRST CAYMAN LTD., REFCO GROUP | : |
| HOLDINGS INC., and JOHN DOES 1 THROUGH | : |
| 10, | : |
| | : |
| Defendants. | : |

----------------------------------------------------------x

Appearances:

MILBANK, TWEED, HADLEY & McCLOY LLP, by Andrew M. Leblanc, for Mark S. Kirschner, as Trustee of the Refco Litigation Trust

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., by Sam Blair, and DECHERT LLP, by Gary J. Mennitt, for Memphis Holdings, LLC

## MEMORANDUM OF DECISION ON MEMPHIS
## HOLDINGS LLC'S MOTION TO DISMISS

Robert D. Drain, United States Bankruptcy Judge

In this adversary proceeding, the plaintiff, as trustee of the Refco Litigation Trust (the "Trustee") under the confirmed chapter 11 plan of Refco Inc. and its affiliated debtors, including the alleged transferor under the Trustee's complaint, Refco Group Ltd., LLC ("RGL"), has sought to avoid and recover various alleged fraudulent transfers, as well as related relief on unjust enrichment and, against certain defendants, equitable subordination grounds. The Trustee has prevailed against, settled with or dismissed his claims against most of the defendants. This Memorandum of Decision addresses the motion of one of the three remaining defendants, Memphis Holdings LLC ("MH") to dismiss the Trustee's claims against it under Fed. R. Civ. P. 12(b)(6) as incorporated by Fed. R. Bankr. P. 7012.

The Trustee has confirmed that his claims against MH are now limited to claims for constructive fraudulent transfer and unjust enrichment; he has also confirmed that the amount at issue has been reduced to $4 million. At the same status conference, MH has confirmed that it will rest on its original motion to dismiss and the pleadings filed to date. For the reasons set forth below, MH's motion to dismiss is granted.

### Jurisdiction

Jurisdiction over this proceeding derives from 28 U.S.C. § 1334(b) because the Trustee's avoidance claims under 11 U.S.C. § 544(b) specifically arise under the Bankruptcy Code and the Trustee's unjust enrichment claim (to the extent that it does not also arise under section 544 of the Bankruptcy Code) is related to these chapter 11 cases

2

for purposes of 28 U.S.C. § 1334(b) in that it would augment the estate if successful.

Such jurisdiction has continued after the confirmation of the Refco debtors' chapter 11

plan:  the liquidating chapter 11 plan specifically reserved jurisdiction over litigation

claims such as those asserted in this adversary proceeding, having provided for the

creation of the Refco Litigation Trust to pursue such claims; and the adversary

proceeding has a close nexus to the plan and the chapter 11 cases because it affects the

implementation and execution of the chapter 11 plan and the litigation trust agreement

incorporated in it.  Rahl v. Bande, 316 B.R. 127, 133-34 (S.D.N.Y. 2004); Penthouse

Media Group v. Guccione (In re Gen. Media, Inc.), 335 B.R. 66, 73-74 (Bankr. S.D.N.Y.

2005).  See also Newby v. Enron Corp. (In re Enron Corp Sec.), 535 F.3d 325, 335-36

(5th Cir. 2008).  If the Trustee is successful, the claims asserted in his complaint

constitute significant assets for distribution to creditors.

This Court's jurisdiction over the adversary proceeding derives from 28 U.S.C. §

157(a), which states that each district court, having been conferred with jurisdiction under

28 U.S.C. § 1334(b), may provide that "all cases under title 11 and any or all proceedings

arising under title 11 or arising in or related to a case under title 11 shall be referred to the

bankruptcy judges for the district," and the Order of Acting Chief Judge Robert J. Ward,

dated July 10, 1984 (the "Standing Order of Reference"), which so provides.[1]

---

[1] The Standing Order of Reference states in its entirety, "Pursuant to Section 157(a) of the Bankruptcy
Amendments and Federal Judgeship Act of 1984, any or all cases under title 11 and any or all proceedings
arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for
this district."

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O). Accordingly, under 28 U.S.C. § 157(b)(1), this Court has the power to hear and determine this proceeding by final order and judgment.

The Supreme Court's decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), however, which held that a different subsection of the Judicial Code, 28 U.S.C. § 157(b)(2)(C), unconstitutionally conferred on the bankruptcy courts, as courts established under Article I not Article III of the Constitution, the power to issue final judgments, id. at 2601, raises two issues with respect to the Court's power to decide this proceeding. The first is whether this proceeding to determine, avoid and recover a fraudulent transfer and a related unjust enrichment claim, covered by 28 U.S.C. § 157(b)(2)(H) and (O), respectively, so resembles the state law tortious interference counterclaim covered by 28 U.S.C. § 157(b)(2)(C) at issue in Stern, 131 S. Ct. at 2601, 2608, as to preclude this Court's ability to issue a final judgment. Note that this is not a question about the Court's subject matter jurisdiction; litigants and at least one court[2] contending to the contrary misread Stern and ignore the expansive nature of the bankruptcy courts' subject matter jurisdiction.[3]

The second question, however, does raise an issue of subject matter jurisdiction: if the Court lacks the constitutional power to issue a final judgment in this proceeding, does it have statutory or other authority to submit proposed findings of fact and conclusions of law to the district court under the Judicial Code, Fed. R. Bankr. P. 9033 or the Standing Order of Reference? This question arises because 28 U.S.C. § 157(b)(2) states that

---

[2] Sitka Enters. v. Segarra-Miranda, 2011 U.S. Dist. LEXIS 90243, at *7-8 (D. P.R. Aug. 10, 2011).
[3] See, e.g., Marshall v. Marshall, 547 U.S. 293 (2006); Cent. Va. Cmty. College v. Katz, 546 U.S. 356 (2006); Celotex v. Edwards, 514 U.S. 300 (1995).

4

"bankruptcy judges may hear and determine … all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title," and 28 U.S.C. § 157(c)(1) states that "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11, [in which case] the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected," but Stern can be said to have created a new type of proceeding: a core proceeding in which the bankruptcy judge is constitutionally precluded from entering a final order or judgment.  This, in turn, raises the issue whether there is a gap in the statutory scheme preventing the Court's submission of proposed conclusions of law to the district court if a matter falls into the new "core but precluded" category.  See also Fed. R. Bankr. P. 9033(a), which -- understandably, because Congress did not anticipate Stern's new category of unconstitutional core proceedings -- provides only for the bankruptcy judge's filing of proposed findings of fact and conclusions of law "[i]n non-core proceedings heard pursuant to 28 U.S.C. § 157(c)(1)."

Given the procedural stage of this proceeding, the answer to the first question is not particularly meaningful.  First, the denial of MH's motion to dismiss in whole or in part, would be only an interlocutory order, and thus could not in any event be subject to Stern's prohibition of this Court's entry of final judgments (subject, though, to rights under Fed. R. Bankr. P. 7054(a), incorporating Fed. R. Civ. P. 54(b)).  Moreover, an

order and judgment granting MH's motion to dismiss, like an order granting summary judgment, would contain no factual findings and would be subject to the same <u>de novo</u> standard of review on appeal as proposed conclusions of law and a recommendation to the district court. <u>See</u> <u>Retired Partners of Coudert Brothers Trust v. Baker & McKenzie LLP</u>, (<u>In re Coudert Bros. LLP</u>), 2011 U.S. Dist. LEXIS 110425, at *36-37 (S.D.N.Y. Sept. 22, 2011). The second question, however, bears on the Court's jurisdiction to enter any order on MH's motion, as well as potentially on the future conduct of this proceeding, including possible motions to withdraw the reference.[4] Therefore, the Court sets forth below its reasons for concluding that <u>Stern</u> does not preclude the Court's issuance of a final judgment on the Trustee's complaint and that, in any event, the Court has the power to submit proposed conclusions of law and a recommendation to the district court on MH's motion to dismiss, if the district court so wishes to treat the Court's ruling.

Reasonable people may differ over whether <u>Stern</u>'s prohibition on the bankruptcy court's issuance of a final judgment extends to fraudulent transfer claims, at least where, as here, the defendant has not filed a proof of claim in the case and, therefore, the holdings of <u>Katchen v. Landy</u>, 382 U.S. 323 (1966), and <u>Langencamp v. Culp</u>, 498 U.S. 42 (1990), which <u>Stern</u> found to comport with its holding, 131 S. Ct. at 2616-2617, would not apply. <u>Compare</u> <u>Paloian v. American Express Co.</u> (<u>In re Canopy Fin. Inc.</u>), 2011 U.S. Dist. LEXIS 99804, at *7-8 (N.D. Ill. Sept. 1, 2011), <u>and</u> <u>Hagan v. Freedom Fid. Mgmt.</u>

---

[4] See <u>Kelley v. JPMorgan Chase & Co.</u>, 2011 U.S. Dist. LEXIS 107427, at *18-24 (D. Minn. Sept. 21, 2011). <u>Cf.</u> <u>Walker, Truesdell, Roth & Assocs. v. The Blackstone Group</u> (<u>In re Extended Stay, Inc.</u>), 11 Civ. 5394 (SAS) (S.D.N.Y. Nov. 10, 2011); <u>Field v. Lindell</u> (<u>In re The Mortgage Store, Inc.</u>), 2011 U.S. Dist. LEXIS 123506, at * 19-20 (D. Haw. Oct. 5, 2011) (determining not to withdraw the reference even if <u>Stern</u> applied to fraudulent transfer proceeding because "[w]ithdrawal of the reference at this stage would result in this court losing the benefit of the bankruptcy court's experience in both the law and the facts, resulting in an inefficient allocation of judicial resources").

(In re Fife), 2011 Bankr. Lexis 3544, at *1 (Bankr. W.D. Mich. Aug. 22, 2011), adopted by, judgment entered by, 2011 U.S. Dist. LEXIS 106446 (D. W.D. Mich. Sept 20, 2011), and Samson v. Blixseth (In re Blixseth), 2011 Bankr. LEXIS 2953, at *33-34 (Bankr. D. Mont. Aug. 1, 2011) (holding that under Stern bankruptcy court lacks power to issue a final judgment on fraudulent transfer claim), with Heller Ehrman LLP v. Arnold & Porter, LLP (In re Heller Ehrman LLP), 2011 Bankr. LEXIS 3764, at *16-24 (Bankr. N.D. Cal. Sept. 28, 2011), and In re Safety Harbor Resort & Spa, 2011 Bankr. LEXIS 3238, at *30, *35-36 (Bankr. M.D. Fla. Aug. 30, 2011), and Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs., Inc.), 2011 Bankr. LEXIS 2806, at *8-9 (Bankr. D. Del. July 28, 2011) (holding that bankruptcy court has power after Stern to issue a final judgment on fraudulent transfer claim); see also Springer v. Prosser (In re Innovative Commun. Corp.), 2011 Bankr. LEXIS 3040, at *13-14 (Bankr. D. V.I. Aug. 5, 2011) (bankruptcy court has power to issue final judgment in avoidance proceeding under 11 U.S.C. §§ 548 and 549, but might not under 11 U.S.C. § 544).

This confusion stems in large measure from the various rationales stated by the majority for its holding in Stern. Indeed, as noted by Justice Scalia's concurring opinion, there are

> at least seven different reasons given in the Court's opinion for concluding that an Article III judge was required to adjudicate this law-suit: that it was one "under state common law" which was "not a matter that can be pursued only by grace of the other branches," ante, at 27; that it was "not 'completely dependent upon' adjudication of a claim created by federal law," ibid.; that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings," ibid.; that "the asserted authority to decide Vickie's claim is not limited to a 'particularized area of the law,'" ante, at 28; that "there was never any reason to believe that the process of adjudicating Pierce's proof of claim would necessarily resolve Vickie's counterclaim," ante, at 32; that the trustee was not "asserting a right to recovery created by federal bankruptcy law," ante, at

33; and that the Bankruptcy Judge "ha[d] the power to enter 'appropriate
orders and judgments' -- including final judgments -- subject to review
only if a party chooses to appeal," <u>ante</u>, at 35.

<u>Id.</u> at 2621.  To that list might be added Justice Scalia's possible willingness to defer to

Congress' intent in 28 U.S.C. § 157(b) where there is "a firmly established historical

practice to the contrary" requiring proceedings in bankruptcy to be decided by Article III

judges, <u>id.</u>, apparently because such an established historical practice may justify finding

a certain type of decision-making to be within the traditional scope of "the restructuring

of debtor-creditor relations" in which the <u>Stern</u> majority suggested bankruptcy courts

might -- although not necessarily would -- be able to issue final orders and judgments.

<u>Id.</u> at 2614 n.7.

Clearly several of these rationales argue that <u>Stern</u> does not preclude the bankruptcy

court from issuing a final judgment on a fraudulent transfer claim.  Unlike the state law

tortious interference claim in <u>Stern</u>, the Trustee's fraudulent transfer claim here "flow[s]

from a federal statutory scheme," and is "completely dependent upon adjudication of a

claim created by federal law."  <u>Id.</u> at 2614.  That is, not only is the Trustee's fraudulent

transfer cause of action expressly provided by the Bankruptcy Code, 11 U.S.C. § 544, but

also Congress placed that section, as well as the other statutory avoidance powers under

11 U.S.C. §§ 547, 548, 549 and 553, within a unique statutory framework, such as the

safe harbor of 11 U.S.C. § 546(e), the recovery and preservation provisions of 11 U.S.C.

§§ 550 and 551 and the "pay or face claim disallowance" rule of 11 U.S.C. § 502(d).  In

addition, the adjudication of fraudulent transfer claims in a bankruptcy context is a

"particularized area of the law," <u>id.</u> at 2615, because of the place such litigation often

takes in the overall case and the familiarity of bankruptcy courts not only with the

Bankruptcy Code's fraudulent transfer scheme but also with how such cases are developed, paid for, litigated and resolved in the multi-party bankruptcy context, which differs significantly from the two-party state law setting.  Thus several sections of the Bankruptcy Code as well as case law govern the trustee or debtor in possession's unique role in investigating, funding, commencing, litigating and settling fraudulent transfer claims for the benefit of the estate, other parties' limited standing to do so in the trustee's place, and, ultimately, the power of the bankruptcy judge to manage the process in the context of the overall bankruptcy case, for example, where such litigation may be best resolved by the negotiation and confirmation of a chapter 11 plan.  See 11 U.S.C. §§ 704(a) and 1106(a)(1) (duties of a trustee); 1103(c) (role of official committee); 1104(c) and 1106(b) (appointment and role of examiner); 330 and 503(b)(3) and (4) (compensation); 502(d), 541(a)(3) and (4) and 550 and 551 (remedial provisions); and Fed. Bankr. R. 2004 and 9019 (covering investigation and settlement, respectively).  See In re STN Ent., 779 F.2d 901 (2d Cir. 1985) (standing to sue); Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC), 423 F.3d 166, 176-79 (2d Cir. 2005) (standing to settle); Picard v. Taylor (In re Park South Sec., LLC), 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005) ("Wagoner Rule" does not apply to statutory causes of action created by the Bankruptcy Code, such as fraudulent transfer claims under 11 U.S.C. §§ 544 and 548).

   In addition, the pursuit of avoidance claims has been "a core aspect of the administration of bankrupt estates since the 18th century," Cent. Va. Cmty. College v. Katz, 546 U.S. 356, 369-70 (2006), tied to, if not solely based on, the bankruptcy courts' "principally in rem jurisdiction."  Id. (addressing preference avoidance litigation); see

9

also French v. Liebmann (In re French), 440 F.3d 145, 151 (4th Cir. 2006), cert. denied

549 U.S. 815 (2006); Diaz-Barba v. Kismet Acquisition, LLC, 2010 U.S. Dist. LEXIS

50320, at *16-17 (S.D. Cal. May 20, 2010) (addressing fraudulent transfer litigation).[5]

As stated by Justice White in his dissenting opinion in Northern Pipeline Constr. Co. v.

Marathon Pipe Line Co., 458 U.S. 50, 96 (1982), "The routine in ordinary bankruptcy

cases now, as it was before 1978, is to stay actions against the bankrupt, collect the

bankrupt's assets, require creditors to file claims or be forever barred, allow or disallow

claims that are filed, adjudicate preferences and fraudulent transfers, and make pro rata

distributions to creditors, who will be barred by the discharge from taking further actions

against the bankrupt." (Emphasis added.)  Justice White made that point in criticizing the

Marathon plurality for invalidating all of the jurisdictional basis for the 1978 Bankruptcy

Code rather than, at most, the provision of 28 U.S.C. § 1471 that gave bankruptcy courts

the power to decide affirmative prepetition state law contract claims, a non-traditional,

element of bankruptcy jurisdiction.  Id.

    Since the enactment of the Bankruptcy Code, the management and determination of

statutory avoidance claims has been a primary function of the bankruptcy courts.  Such

claims often play a prominent role in bankruptcy cases, either because of their sheer

numbers or because of the effect that the potential avoidance of a transfer, lien or

─────────────────

[5] It is true that fraudulent transfer litigation, like preference litigation, which was treated under the
Bankruptcy Act as a matter of bankruptcy "plenary jurisdiction," could be adjudicated by bankruptcy
referees to final judgment only on the parties' consent.  See 2A, 4, 6 Collier on Bankruptcy ¶¶ 23.08, 23.09,
23.15, 38.08-.09, 67.44[4] (14th ed. 1988).  Nevertheless, this was based on statutory jurisdiction rather than
constitutional power.  See Weidhorn v. Levy, 253 U.S. 268, 273 (1920) (holding that, while "the practice is
not uniform," as a matter of statutory construction and the general order of reference a referee lacked
statutory power to decide preference claim); see also MacDonald v. Plymouth County Trust Co., 286 U.S.
263, 268 (1932) (referee has statutory power to decide preference claim by the parties' consent to a
summary trial).

obligation may have on creditors' recoveries.[6]  This is particularly so in cases where most, if not all, of the debtor's estate was transferred to third parties pre-bankruptcy, such as the many Ponzi-scheme driven cases of recent years, requiring a coordinated response overseen by one judge on behalf of a host of creditor-victims.  The ability to manage efficiently the investigation and litigation of such claims, and their possible global settlement, decreases if handled on a piecemeal basis by different judges, no matter how talented.

Significantly, the Emergency Rule drafted and issued by the Administrative Office of the United States Courts shortly after <u>Marathon</u> recognized the bankruptcy courts' power to issue final judgments in preference and fraudulent transfer proceedings.  Emergency Rule § (d)(3)(A).  Moreover, the courts of appeal, including the Second Circuit, that were asked to address the issue affirmed the constitutionality of this provision of the Emergency Rule.  <u>In re Committee of Unsecured Creditors of F S Commc. Corp v. Hyatt Greenville Corp.</u>, 760 F.2d 1194, 1199 (11th Cir. 1985) (preference claims); <u>John E. Burns Drilling Co. v. Central Bank of Denver</u>, 739 F.2d 1489, 1493-94 (10th Cir. 1984) (fraudulent transfer and preference claims); <u>In re Kaiser</u>, 722 F.2d 1574 (2d Cir. 1983) (fraudulent transfer claims). As stated by the <u>Kaiser</u> court,

> What appellant ignores, however, is that this action was brought as a result of his fraudulent transfer in light of the bankruptcy laws.  This action is inextricably tied to the creation of the estate in bankruptcy for the benefit of [the debtor's] creditors; there would be no cause of action without the federal bankruptcy statutes to authorize it.  In other words, federal law provides the <u>right</u> upon which the remedy of the constructive trust here is based.  In contrast, the action in <u>Marathon</u> was independent of the bankruptcy laws. . . .  The present action is not a "traditional" action to

---

[6] Statutory avoidance claims under the Bankruptcy Code may not be the meat and potatoes of bankruptcy practice, but they are at least the salad and dessert, in marked contrast with the peculiar tortious interference claim in <u>Stern</u>.

> impose a constructive trust upon real estate. It has no life of its own in either state or federal common law or statute independent of the federal bankruptcy law.

Id. at 1582 (emphasis in the original).

This approach also continued on a widespread basis after the 1984 enactment of the Federal Judgeship Act of 1984 ("BAFJA"), which set forth the core/non-core structure presently governing bankruptcy court jurisdiction. As a general matter, "[s]ince BAFJA's enactment in 1984 both the Supreme Court and this Court have concluded that the Marathon holding was a narrow one and have broadly construed the jurisdictional grant of BAFJA." Universal Oil Ltd. v. AllFirst Bank (In re Millenium Seacarriers Inc.), 419 F.3d 83, 99 (2d Cir. 2005) (Sotomayor, J) (bankruptcy court has power to decide validity of maritime lien); see also In re Arnold Print Works, Inc., 815 F.2d 165, 169-71 (1st Cir. 1987) (Breyer, J) (bankruptcy court has power to decide dispute over breach of postpetition contract). In so holding, both Millenium Seacarriers, 419 F.3d at 99, and Arnold Print Works, 815 F.2d at 166, recognized that the Supreme Court had since taken a narrow view of Marathon in Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 584 (1985) ("The Court's holding in [Marathon] establishes only that Congress may not vest in a non-Article III Court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review."). See also Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 839, 848-53 (1986).

More specifically, courts almost uniformly sustained the constitutionality of BAFJA's grant of power to the bankruptcy courts to decide preference and fraudulent transfer claims as part of their core jurisdiction. See, e.g., Duck v. Munn (In re Mankin), 823

F.2d 1296 (9th Cir. 1987), cert. denied, 485 U.S. 1006 (1988) (fraudulent transfer claim);

Addison v. O'Leary 68 B.R. 487, 490-91 (E.D. Va. 1986) (fraudulent transfer claim); In

re Outlet Dep't Stores, Inc., 82 B.R. 694, 696-97 (Bankr. S.D.N.Y. 1988) (preference

claim).  But see Slutsky v. Byrd (In re Byrd) 51 B.R. 645, 648-49 (Bankr. S.D. Ohio

1985) (holding that bankruptcy court lacked power to issue final judgment on fraudulent

transfer claim under 11 U.S.C. § 544).  The Ninth Circuit's discussion of the

constitutional issue in Mankin relies heavily on Marathon's recognition that "Congress

has greater discretion in prescribing the manner in which rights of its own creation are

determined."  Mankin, 823 F.2d at 1305, citing Marathon, 458 U.S. at 81-82.  As

distinguished from the prepetition contract claim in Marathon, the Ninth Circuit found

that

> [h]ere it is clear that Congress conferred the right on the trustee to set
> aside [fraudulent] conveyances which could be set aside under state law
> for the purpose of restructuring debtor-creditor relations pursuant to the
> federal bankruptcy power.  While the rule of decision is supplied by state
> law, the concern in applying the rule is to effectuate the policy of federal
> bankruptcy law. . . .  Congress has found, and we agree, that this
> proceeding falls within the core of federal bankruptcy power.

Mankin, 823 F.2d at 1309.

    After Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989), however, in which the

Supreme Court saw fit to use the public right/private right analysis of Marathon to help it

determine the entitlement under the Seventh Amendment of a defendant in a fraudulent

transfer proceeding to a jury trial, the bankruptcy courts' power to issue final judgments

in avoidance proceedings was left more open to doubt.  At least where the defendant had

not filed a proof of claim, Granfinanciera concluded, in the Seventh Amendment context,

that fraudulent conveyance actions were "more accurately characterized as a private

rather than a public right as we have used those terms in our Article III decisions," id. at 55, being "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankruptcy corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." Id. at 56. Thereafter, at least two courts questioned the bankruptcy courts' power to issue a final judgment in a fraudulent transfer proceeding. McFarland v. Leyh (In re Texas General Petroleum Corp.), 52 F.3d 1330, 1336-37 (5th Cir. 1995) ("Whether an Article III Court is necessary involves the same inquiry as whether a litigant has a Seventh Amendment right to a jury trial." Defendant had, however, consented to bankruptcy court's adjudication of the claim, so the issue was moot); Zahn v. Yucaipa Capital Fund (In re Almac's), 202 B.R. 648, 658-59 (D. R.I. 1996) (reference withdrawn in part because of conclusion that bankruptcy court could not issue a final judgment); see also In re Davis, 899 F.2d 1136, 1140 n.9 (11th Cir. 1990), cert. denied sub nom Gower v. Farmers Home Admin. 498 U.S. 981 (1990) (listing contrasting cases).

On the other hand, by far the majority of courts after Granfinanciera continued to hold that bankruptcy courts had the power to issue final judgments in fraudulent transfer proceedings as core matters.[7] See, e.g., Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers), 4 F.3d 1556, 1561 (10th Cir. 1993), cert. denied 510 U.S. 1114 (1994); Hillsborough Holdings Corp. v. Celotex Corp., 123 B.R. 1018, 1022 (M.D. Fla. 1990). Numerous opinions distinguished between the right to a jury trial, at issue in Granfinanciera, and the power of a bankruptcy court to issue a final order

---

[7] Moreover, thousands of courts and litigants simply continued to assume that the bankruptcy courts had the constitutional as well as the statutory power to issue final judgments in fraudulent transfer proceedings.

14

notwithstanding its Article I status, finding that the jury trial issue implicated in Granfinanciera did not restrict the bankruptcy courts' power to decide motions to dismiss and summary judgment motions on fraudulent transfer claims on a final basis. See, e.g., Glinka v. Abraham & Rose Co., 1994 U.S. Dist. LEXIS 21328, at *20-25 (D. Vt. June 2, 1994); Stein v. Miller, 158 B.R. 876, 880 (S.D. Fla. 1993); City Fire Equip. Co. v. Ansul Fire Protection Wormald U.S., Inc., 125 B.R. 645, 649 (N.D. Ala. 1989) (en banc); Reitmeyer v. Meinen (In re Meinen), 232 B.R. 827, 833 (Bankr. W.D. Pa. 1999).

Of course, though, the majority in Stern applied the logic of Granfinanciera's Seventh Amendment decision to the Article III question before it: "Vickie's counterclaim -- like the fraudulent conveyance claim at issue in Granfinanciera -- does not fall within any of the varied formulations of the public rights exception in this Court's cases," Stern, 131 S. Ct. at 2614, thus suggesting that the majority in Stern would have concluded, if asked, that a bankruptcy judge lacks the power to issue a final order or judgment on a fraudulent transfer claim. Nevertheless, the other express rationales for the majority's decision in Stern, summarized by Justice Scalia as quoted above, argue differently. They are, as noted above, entirely consistent with the role of fraudulent transfer and other statutory avoidance claims under the Bankruptcy Code, with the Emergency Rule, and with the clear majority of holdings after Marathon and Granfinanciera that bankruptcy courts have the constitutional power to issue final judgments on statutory avoidance claims. It is, therefore, appropriate to read those alternative rationales (perhaps best highlighted by the majority having distinguished Katchen and Lankgencamp based on the fact that in those cases "the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law," Stern, 131 S. Ct. at 2618) not to "arouse the suspicion that

something is seriously amiss with [the Supreme Court's] jurisprudence in this area," id. at 2621 (Scalia, J. concurring), but, rather, to confirm that the majority in Stern took pains to keep its rationale within the context of the more narrow parameters established by Thomas v. Union Carbide and Schor, especially regarding the recognition of Article I authorities' power to decide congressionally created rights.

In this regard it is significant that Chief Justice Roberts characterized Stern as resolving only a "narrow" question, id. at 2620, concluding that "Congress, in one isolated respect, exceeded [Article III's] limitation [on Congress' power] in the Bankruptcy Act of 1984" such that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." Id. That language is not materially different from Thomas's summary of Marathon. See 473 U.S. at 584. Indeed, "Stern is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case. . . ." In re Salander O'Reilly Galleries, 2011 Bankr. LEXIS 2688, at *18-22 (Bankr. S.D.N.Y. July 18, 2011) (listing instances of limiting language in Stern).

Moreover, the Supreme Court has consistently acknowledged the complexity of its holdings on the Article I/Article III issue, most recently by Justices Scalia and Breyer in Stern itself. Stern, 131 S. Ct. at 2621 (Scalia, J. concurring), and 2622 (Breyer, J. dissenting). See also Marathon, 458 U.S. at 93 (White, J. dissenting) (describing the Article I/Article III jurisprudence as "one of the most confusing and controversial areas of constitutional law"); Elizabeth Gibson, *Jury Trials and Core Proceedings: The Bankruptcy Judge's Uncertain Authority*, 65 AM. BANKR. L. J. 143, 174 (Winter 1991)

16

(discussing the procession of <u>Marathon</u>, <u>Thomas</u>, <u>Schor</u> and <u>Granfinanciera</u>:   "How a majority of the Court could have embraced these opposing views of Article III within the span of less than a decade is difficult to understand.   Even more troubling is the fact that the Court's analysis appears to remain in a state of flux.").

This is ultimately so because it is clear from the Supreme Court cases, including the majority opinion in <u>Stern</u>, that non-Article III tribunals are clearly permitted substantial decision-making authority.   <u>See</u> 131 S. Ct. at 2614-18.[8]   As stated in <u>Thomas</u>:

> An absolute construction of Article III is not possible in this area of frequently arcane distinctions and confusing precedents. . . . Instead, the Court has long recognized that Congress is not barred from acting pursuant to its powers under Article I to vest decision making authority in tribunals that lack the attributes of Article III courts.

473 U.S. at 583 (citations omitted).   As further recognized in <u>Schor</u>:

> Although our precedents in this area do not admit of easy synthesis, they do establish that the resolution of claims such as Schor's cannot turn on conclusory reference to the language of Article III.   Rather, the constitutionality of a given congressional delegation of adjudicative function to a non-Article III body must be assessed by reference to the purposes underlying the requirements of Article III. This inquiry, in turn, is guided by the principle that practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.

478 U.S. at 847 (quotations and citations omitted).   Drawing the appropriate line therefore is sometimes necessarily difficult but not impossible.   Given the repeated and emphatic limiting language in <u>Stern</u>, the Emergency Rule and the case law discussed

---

[8] One of the clearest examples of this, of course, is the power, recognized by <u>Stern</u> as well as decisions going back over a hundred years, of bankruptcy judges (and referees under the Bankruptcy Act) to decide complex issues of non-bankruptcy law in numerous contexts involving claims against and property of the estate.   <u>See Stern</u>, 131 S. Ct. 2594; <u>Ohio v. Kovacs</u>, 469 U.S. 274 (1985); <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979).

above -- including <u>Millenium Seacarriers</u>, 419 F.3d at 83, and <u>Kaiser</u>, 722 F.2d at 1582, which are fundamentally consistent with <u>Stern</u> and thus should be controlling -- and the role of fraudulent transfer claims under the Bankruptcy Code, including their management and resolution ultimately by the bankruptcy courts in the context of Congress' bankruptcy scheme,[9] Article III of the Constitution does not prohibit the bankruptcy courts' determination of fraudulent transfer claims under 11 U.S.C. §§ 544 and 548 by final judgment.

Even if the Court did not have that power, it does have the power to submit to the district court proposed conclusions of law and a recommendation to grant MH's motion, notwithstanding that, understandably, the Judicial Code and Bankruptcy Rules do not specifically contemplate bankruptcy courts issuing proposed findings of fact and conclusions of law in core matters where the particular provision of 28 U.S.C. § 157(b)(2) is found to violate Article III of the Constitution. <u>Stern</u> did not find Congress' grant of jurisdiction to the bankruptcy courts through 28 U.S.C. § 157(a) and the Standing Order of Reference unconstitutional; it found a specific provision of 28 U.S.C. § 157(b)(2) unconstitutional to the extent that it gives bankruptcy courts the power to enter a final judgment on a type of matter required to be decided by an Article III court. <u>See</u>

---

[9] In that context, and consistent with Justice Breyer's observations in <u>Stern</u>, albeit in dissent, 131 S. Ct. at 2626-7, it seems rather far-fetched that the fact that the Second Circuit appointed this Court for a 14 year term, renewable by the Second Circuit, and that the Court's salary and benefits are tied only by statute to the district courts' salary and benefits would raise such profound separation-of-powers and liberty questions as to overturn Congress' post-<u>Marathon</u> intent and ample precedent, although perhaps this point is better addressed by an Article III court free from any imputation of bias. <u>See</u> Linda L. Coco, "Stigma, Prestige and the Cultural Context of Debt:  A Critical Analysis of the Bankruptcy Judge's Non-Article III Status," 16 Mich. J. Race & L. 181, 231-32 (2011).  It would appear that a more direct affront to Article III would be the imposition by Congress of such restraints on the bankruptcy courts that their workload was imposed on the district courts.

131 S. Ct. at 2620. In so doing, <u>Stern</u> strongly suggested that the counterclaim should instead be treated as a "related to" matter under 28 U.S.C. § 157(c):

> …[T]he current bankruptcy system . . . requires the district court to review <u>de novo</u> and enter final judgment on any matters that are "related to" the bankruptcy proceedings, and permits the district court to withdraw from the bankruptcy court any referred case, proceeding or part thereof. [Respondent] has not argued that the bankruptcy courts are barred from hearing all counterclaims or proposing findings of fact and conclusions of law on these matters, but rather that it must be the district court that finally decides them. We do not think the removal of counterclaims such as [Petitioner's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute. . . .

<u>Id.</u> (citations and quotations omitted). In other words, <u>Stern</u> "removed" the offending counterclaim from core jurisdiction, and, therefore, under 28 U.S.C. § 157(a) and the general orders of reference, which refer "any all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district," the dispute would devolve into non-core, "related to" jurisdiction covered by 28 U.S.C. § 157(c). See <u>Id.</u>; <u>see also</u> <u>Field v. Lindel</u> (<u>In re The Mortgage Store, Inc.</u>), 2011 U.S. Dist. LEXIS 123506, at *18 (D. Haw. Oct. 5, 2011); <u>see also</u> <u>Paoloian v. Am. Express Co.</u> (<u>In re Canopy Fin., Inc.</u>), 2011 U.S. Dist. LEXIS 99804 (N.D. Ill. Sept. 1, 2011); <u>see also</u> <u>Hagan v. Freedom Fid. Mgmt.</u> (<u>In re Fife</u>), 2011 U.S. Dist. LEXIS 106446, at *1-2 (W.D. Mich. Sept. 20, 2011). <u>But see</u> <u>Samson v. Blixeth</u> (<u>In re Blixeth</u>), 2011 Bankr. LEXIS 2953, at *28-36 (Bankr. D. Mt. Aug. 1, 2011).

Such a result clearly comports with the directive that when addressing the consequences of holding a statute unconstitutional courts must impose a remedy that best corresponds to what Congress would have intended if it had known about such holding. See <u>United States v. Booker</u>, 543 U.S. 220, 246 (2004) (citing <u>Denver Area Ed. Telecommunications Consortium, Inc. v. FCC</u>, 518 U.S. 727, 767 (1996)). Here, it would

19

be absurd to conclude that the bankruptcy courts are deprived of jurisdiction over matters designated by Congress as core when, for Article III reasons, Congress gave jurisdiction to bankruptcy courts to issue proposed findings of fact and conclusions of law in non-core matters.  See, e.g., In re Mortgage Store, Inc., 2011 U.S. Dist. LEXIS 123506, at *14-17; see also In re Coudert Bros. LLP, 2011 U.S. Dist. LEXIS 110425, at *40 (deeming bankruptcy court judgment granting a motion to dismiss to be proposed conclusions of law and recommendation by stating, "Stern suggests that the usual division of labor should not be much upset."); Gecker v. Flynn (In re Emerald Casino, Inc.), 2011 Bankr. LEXIS 3324, at 6-7* n.1 (Bankr. N.D. Ill. Aug. 26, 2011) ("Even if the Supreme Court had not already directed a more reasonable remedy for the constitutional violation it found in Stern, the perverse effect of the remedy suggested by defendants' argument would require that it be rejected.").  Therefore, if on review it is found that this Court did not have the power to issue a final order granting MH's motion, the Court has the jurisdiction to have deemed this decision and its order to be proposed conclusions of law and a recommendation.

## Background

Although much of the Trustee's complaint does not relate to his claims against MH, a brief summary is in order.[10]  Immediately before its chapter 11 filing, Refco Inc. was a Delaware public company that through its subsidiaries provided brokerage, execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets.  Complaint, ¶ 18.  The October 17, 2005

---

[10] Of course, for purposes of MH's motion to dismiss, the Court accepts the complaint's factual averments as true and draws all inferences in the Trustee's favor. LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009).

chapter 11 filings and eventual liquidation of Refco Inc. and a number of its wholly

owned subsidiaries (the "Refco Debtors") followed a crisis of customer confidence

precipitated by the October 10, 2005 disclosure of an apparent financial fraud involving

Refco's President and CEO, Phillip R. Bennett and Bennett's arrest the next day.  Id., ¶¶

56-58.

The complaint is "based on the [subsequent] investigation of the Trustee and his

counsel and a review of, among other things, (a) the filings of Refco Inc. with the [SEC];

(b) certain of the Debtors' books and records and other Refco Debtor documents; (c)

documents produced in response to subpoenas issued pursuant to Rule 2004 of the

Federal Rules of Bankruptcy Procedure in [these chapter 11 cases]; (d) the final report of

the court-appointed independent examiner (the 'Examiner') in the Bankruptcy Cases, and

interviews of persons conducted in connection with the preparation of that Report; (e) the

superseding Indictment in U.S. v. Phillip R. Bennett, et al., Case No. 05 Cr. 1192 (NRB)

(S.D.N.Y. Jan. 16, 2007); (f) interviews with certain employees and former employees of

Refco; and (g) other relevant public documents."  Complaint, ¶¶ 2-3.

In light of that information, the Trustee alleges that Bennett "with the aid and

assistance of various co-conspirators, including former Refco owners (Tone Grant and

Thomas Dittmer), former Refco executives (Santo Maggio and Robert Trosten), and

others (hereinafter the 'Bennett Co-Conspirators')" perpetrated a massive fraud for more

than eight years before the chapter 11 filings.  Id., ¶ 1.  MH is not specifically identified

in the complaint as a "Bennett Co-Conspirator," however, and, although the complaint

alleges, upon information and belief, that "each of the Defendants had knowledge of one

or more aspects of the fraudulent scheme described above, or alternatively, such

21

Defendant consciously avoided knowledge of the massive fraudulent scheme perpetrated by the Bennett Co-Conspirators" id., ¶ 86, the Trustee has since withdrawn his intentional fraudulent transfer claim against MH and made it clear that he does not allege that MH had knowledge of or put on blinders with respect to the Bennett Co-Conspirators' fraudulent scheme. Indeed, unlike the other defendants, MH is not even alleged to have been an insider of the Refco Debtors.

The Bennett Co-Conspirators' fraudulent scheme was fairly simple, but its consequences were massive, resulting in at least hundreds of millions of dollars of losses for the Refco Debtors and, because the Refco Debtors proved to be insolvent, their creditors. The Bennett Co-Conspirators hid hundreds of millions of dollars of direct and indirect trading losses and operating expenses from the Refco Debtors' customers, creditors and potential investors "within and behind a number of fraudulently engineered financial transactions." Id., ¶¶ 3-4, 59. These surreptitious devices included (a) improperly booking as receivables uncollectible customer debts that should have been written-off, id.,¶ 63, (b) assigning other uncollectible customer debts and proprietary trading losses to a parent holding company, Refco Group Holdings, Inc. ("RGHI") and treating the receivable from RGHI to Refco Debtors and interest thereon as income when RGHI lacked the ability to pay this "debt," id., ¶¶ 64-68, 72-73, and (c) hiding operating expenses properly charged to Refco Debtors by shifting such expenses to RGHI, with another increase in the already uncollectible RGHI receivable. Id., ¶¶ 69-71.

Further, to avoid disclosing the RGHI receivable in Refco's financial statements as a related-party obligation, the Bennett Co-Conspirators implemented "a series of transactions at the end of each fiscal year (and also, starting in 2004, at the end of fiscal

22

quarters) that were designed to temporarily reduce the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed to Refco by unrelated third parties (the 'Round-Trip Loans')." Id., ¶ 75. This practice, which started "as early as February 1998," id., ¶ 76, involved a Refco entity extending a "loan" to an unrelated third party, the third party then "loaning" the same amount to RGHI at a somewhat higher interest rate than the rate on its "loan" from the Refco entity, and RGHI then purporting to pay down the RHGI receivable with the proceeds. Then, "[a] few days after the close of the reporting period, the parties would unwind the entire transaction" with the exception of the third party's fee (the spread between the interest on its "loan" from Refco and its "loan" to RGHI). Id., ¶ 76-78. "There were approximately 30 Round-Trip Loans from 1998 through 2005" that "caused the RGHI Receivable to be underestimated by hundreds of millions of dollars at each relevant reporting period." Id., ¶ 79.

So much for the general fraud at Refco; how, though, does that fraud pertain to the transfer to MH that the complaint seeks to avoid and recover? The Trustee alleges that the ultimate purpose of the fraud was "to allow the Bennett Co-Conspirators, and those persons and entities acting in concert or participation with them, to enrich themselves by stripping hundreds of millions of dollars of assets" from Refco based upon Refco's inflated, fictitious value. Id., ¶ 4. The largest improper payout designed by the Bennett Co-Conspirators stemmed from an August 2004 leveraged buyout in which a third party, Thomas H. Lee Partners L.P. and co-investors purchased a controlling interest in Refco, Inc. (the "LBO") resulting in the transfer of approximately $260.1 million to Bennett Co-Conspirators, as broadly defined. Id., ¶¶ 54, 60, 108, 225 (the "Insider LBO-Related Transfers").

It is here that MH comes in, because it received a payment at the time of the LBO, from RGL. Id., ¶ 161. The payment was on account of MH's rights under a Stock Purchase Agreement entered into three and a half years before, on January 2, 2001 (the "SPA"), pursuant to which MH sold its 15.3% interest in an indirect subsidiary of RGL ("Old Refco") to RGL, id., ¶¶ 33, 156-158, 161, a Delaware corporation and a Delaware limited liability company, respectively. Id., ¶ 17. More specifically, under the SPA, MH received the right to a future, post-closing payment from RGL upon the occurrence of certain conditions. Id., ¶ 158.

The parties have provided the Court with a copy of the SPA referred to in the complaint. SPA paragraph 1 states that the purchase price was $50 million, see SPA ¶ 1(a), plus a "Contingent Purchase Price" in two components: $13 million, see SPA ¶ 1(b), and a variable component determined by a formula. See SPA ¶ 1(c). The complaint accurately summarizes the trigger for the first component of the Contingent Purchase Price, a "Change in Control," of RGL: "(i) the consolidation, sale or merger of RGL; (ii) the liquidation or dissolution of RGL; (iii) Bennett and [Tone] Grant cease to beneficially own more than 50% of the equity of RGL or have less than 50% of the voting power to elect RGL's Board; or (iv) an initial public offering closing in which 20% of the shares of RGL or  [Old Refco] are sold." Complaint, ¶ 158. The second component of the Contingent Purchase Price is triggered under the SPA "[i]n the event of the consummation of the sale, lease, exchange, or other transfer (in one transaction or a series of transactions of all, or substantially all, of the equity securities or asset [sic] of Refco prior to December 31, 2004 where the consideration for such transaction is $900 million or more." See SPA, ¶ 1(c). Upon that occurrence, the SPA provides that MH shall be

24

paid according to the following formula:  P (payment) = E (amount of consideration paid in the subject transaction in excess of $900 million) x R (.014).  Id. The Trustee has confirmed that he is attacking only the $4 million payment resulting from such formula (the "MH LBO-Payment").

He does this on two grounds.  First, he alleges that the MH LBO-Payment was lacking in fair consideration, Complaint, ¶ 238, and made when RGL was insolvent or had unreasonably small capital, id., ¶ 189-190, 239, and, therefore, that the MH LBO-Payment may be avoided and recovered as a constructive fraudulent transfer under 11 U.S.C. § 544(b), incorporating the constructive fraudulent transfer provisions of the New York Debtor-Creditor Law, N.Y. Dr & Cr. L. § 270 et seq. (McKinney 2011) ("NY DCL").  Complaint, ¶¶ 237-40. Second, the Trustee alleges, based on the same facts, that MH was unjustly enriched by the MH LBO-Related Transfer.  Id., ¶¶ 328-32.

## Discussion

## Standard for Dismissal under Rule 12(b)(6)

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must assess the legal feasibility of the complaint, not weigh the evidence that might be offered in its support.  Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).  The Court's consideration "is limited to facts stated on the face of the complaint and in the documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken."  Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993) (citing Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)); see also DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010)

("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect….").

The Court accepts the complaint's factual allegations as true, even if they are doubtful in fact, and must draw all reasonable inferences in favor of the plaintiff, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321-23 (2007); Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001), cert. denied, 535 U.S. 1054 (2002); however, if a complaint's allegations are clearly contradicted by documents incorporated into the pleadings by reference, the Court need not accept them. Labajo v. Best Buy Stores, L.P., 478 F. Supp.2d 523, 528 (S.D.N.Y. 2007).

Moreover, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, the complaint must state more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, while the Supreme Court has confirmed, in light of the notice-pleading standard of FED. R. CIV. P. 8(a), that a complaint does not need detailed factual allegations to survive a motion under Rule 12(b)(6), Erickson v. Pardus, 551 U.S. 89, 93 (2007); Twombly, 550 U.S. at 555, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.[11] If the claim would not otherwise be plausible on its face, therefore, the complaint must allege sufficient additional facts to "nudge [the] claim across the line from conceivable to plausible;" id., at 570; otherwise, the defendant should not be subjected to the burdens of

---

[11] The Trustee's constructive fraudulent transfer claim under section 544(b) of the Bankruptcy Code is subject only to the notice pleading requirements of FED. R. CIV. P. 8(a), not the heightened pleading standard of FED. R. CIV. P. 9(b). Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.), 337 B.R. 791, 801-2 (Bankr. S.D. N.Y. 2005).

continued discovery and the worry of overhanging litigation. Id., at 556. Applying this

plausibility standard is "a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense." Ashcroft v. Iqbal, 128 S. Ct. 1937, 1950

(2009). "Plausibility thus depends on a host of considerations: the full factual picture

presented by the complaint, the particular cause of action and its elements, and the

existence of alternative explanations so obvious that they render plaintiff's inferences

unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

### The Trustee's Fraudulent Transfer Claim

A necessary element of the Trustee's constructive fraudulent transfer claim under NY

DCL §§ 273-275 is that the debtor did not receive fair consideration for the transfer. As

stated by the Second Circuit,

> [A] conveyance by a debtor is deemed constructively fraudulent [that is,
> avoidable regardless of the transferor's intent] if it is made without 'fair
> consideration,' and (inter alia) if one of the following conditions is met:
> (i) the transferor is insolvent or will be rendered insolvent by the transfer
> in question, DCL § 273; (ii) the transferor is engaged in or is about to
> engage in a business transaction for which its remaining property
> constitutes unreasonably small capital, DCL § 274; or (iii) the transferor
> believes that it will incur debt beyond its ability to pay, DCL § 275.

Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.), 403 F.3d

43, 53-54 (2d Cir. 2005). See also Am. Inv. Bank v. Marine Midland Bank, 595

N.Y.S.2d 537, 538, 191 A.D.2d 690 (2d Dep't 1993) ("The burden of proving both

insolvency and the lack of fair consideration is upon the party challenging the

conveyance.").

NY DCL § 272 provides that "[f]air consideration is given for property . . . [w]hen in

exchange for such property . . . as a fair equivalent therefor, and in good faith, property is

conveyed or an antecedent debt is satisfied." The Sharp Court stated that

> The fair consideration test is profitably analyzed as follows: (1) . . . the recipient of the debtor's property[] must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be the 'fair equivalent' of the property received; and (3) such exchange must be 'in good faith.'

403 F.3d at 53-54 (quoting HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1058-59 (2d Cir. 1995)).

Because the $4 million MH LBO-Related Transfer was made to satisfy RGL's antecedent obligation under the SPA, it clearly meets the first prong of the "fair consideration test of NY DCL § 272. "'Good faith' in a constructive fraudulent conveyance claim is the good faith of the transferee," Sharp Int'l, 403 F.3d at 54 n.4, which the Trustee's complaint does not allege was lacking here. There is no dispute, either, that the $4 million transferred to MH was the amount derived by the formula in the PSA; therefore, the complaint does not allege a transfer for less than the "fair equivalent" of RGL's obligation under SPA ¶ 1(c).

The Second Circuit in Sharp also made it clear that the mere existence of an underlying fraud on creditors (in this case, the "Bennett Co-Conspirator" fraud) does not transform into a constructive fraudulent transfer a payment in satisfaction of an antecedent debt that enabled the fraudsters to further such fraud. Id. at 54-55. This was so even though the transferee in Sharp, unlike MH, knew or had reason know that the debtor was defrauding other creditors: "[A] lack of good faith 'does not ordinarily refer to the transferee's knowledge of the source of the debtor's monies which the debtor obtained at the expense of other creditors.'" Id., at 55 (quoting Boston Trading Grp., Inc. v. Burnazos, 835 F.2d 1504, 1512 (1st Cir. 1987)). See also Balabar-Strauss v. Sixty-Five Brokers (In re Churchill Mtg. Inv. Corp.), 256 B.R. 664, 681 (Bankr. S.D.N.Y.

2000), (where broker lacked knowledge of Ponzi scheme, "[t]he fact that the debtor's enterprise as a totality is operated at a loss, or in a manner that is fraudulent, does not render actually or constructively fraudulent a particular transaction which in and of itself is not fraudulent in any respect."), aff'd, 264 B.R. 303, 308 (S.D.N.Y. 2001). Rather, at least for non-insiders such as the lender in Sharp and MH, "New York fraudulent conveyance law . . . is primarily concerned with transactions that shield company assets from creditors." Sharp Int'l, 403 F.3d at 55-56. Therefore, because the $4 million MH LBO-Related Transfer satisfied an equivalent amount of antecedent debt and was received in good faith by MH, it was made with fair consideration, and a necessary element of the Trustee's constructive fraudulent transfer claim fails on its face. See id.; see also Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A., 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (1st Dep't 1993).

The Trustee's argument to the contrary, based on his contention that the MH LBO-Related Transfer was on account of an "equity like" interest that should be seen as junior to RGI's creditors' unpaid claims, is unavailing. First, the $4 million payment under the SPA was not tied to or conditioned upon any return to Refco's shareholders; it did not depend on Refco's shareholders necessarily receiving anything. Instead, the contingent payment was triggered by "the transfer . . . of all, or substantially all, of the equity securities or asset [sic] of Refco prior to December 31, 2004 where the consideration for such transaction is $900 million or more." SPA ¶ 1(c). The complaint does not allege that the $900 million threshold was necessarily the point where Refco's debts would be repaid and shareholders would start to receive a distribution. It was, instead only a bargained for condition to a previously deferred payment under SPA ¶ 1(c) becoming

29

fixed. Moreover, it was a variable over which MH, which had sold its equity in Old
Refco three-and-a-half years before, had no control, as it had no control over RGI. It
therefore lacks the hallmarks of an equity investment as opposed to an antecedent debt
obligation. See Racusin v. American Wagering, Inc. (In re American Wagering, Inc.),
493 F.3d 1067, 1070-73 (9th Cir. 2006); Waters v. Jos. A. Bank Clothiers, Inc., 1995
U.S. Dist. LEXIS 7358, at *14-15 (D. Md. 1995); Official Committee of Unsec. Creds. v.
Am. Capital Fin. Servs. Inc. (In re Mobile Tool Int'l, Inc.), 306 B.R. 778, 782 (Bankr. D.
Del. 2004); In re Motels of Am., Inc., 146 B.R. 542, 543-44 (Bankr. D. Del. 1992).

It is true that a line of New York cases involving the avoidance of deferred or
installment payments under stock repurchase agreement notes runs counter to the
foregoing authorities; however, those cases are not based on the NY DCL but, rather, on
New York Business Corporation Law § 513(a)'s treatment of unlawful distributions to
shareholders.[12] They construe NY BCL § 513(a) to invalidate any installment payment
made at the time the corporation was insolvent, even if, at the time the parties entered
into the repurchase or redemption agreement, the corporation was solvent. See, e.g., Gold
v. Lippman (In re Flying Mailmen Serv. Inc.), 539 F.2d 866, 869 (2d Cir. 1976);
Scherling v. Ehrenkranz (In re Eljay Jrs., Inc.), 123 B.R. 961, 969 (S.D.N.Y. 1991); In re
Dino & Artie's Automotive Transmission Co., 68 B.R. 264, 269 (Bankr. S.D.N.Y. 1986);
Nakano v. Nakano McGlone Nightingale Advertising, Inc., 84 Misc.2d 905, 377
N.Y.S.2d 996, 1000 (N.Y. Cty. 1975). However, Old Refco was a Delaware corporation,
governed by Delaware's General Corporation Law, which recognizes the validity of

---

[12] "A corporation, subject to any restrictions contained in its certificate of incorporation may purchase its
own shares, or redeem its redeemable shares, out of surplus except when currently the corporation is
insolvent or would thereby be made insolvent." N.Y. BUS. CORP. L. § 513(a) (McKinney's 2011).

installment payments under a stock repurchase agreement as long as the corporation was solvent at the time the parties incurred the obligation even if, when the installment payment was made, the corporation was insolvent,[13] see Libco Corp. v. Leigh (In re Reliable Mfg. Corp.), 703 F.2d 996, 1002 (7th Cir. 1983) (construing Delaware law); In re Motels of Am., 146 B.R. at 544; see generally, Dennis F. Dunne, *Stock Repurchase Agreements in Bankruptcy: A Tale of State Law Rights Discarded*, 12 BANK. DEV. J. 355, 362 (1996), and the Trustee's complaint does not allege that Old Refco was insolvent when the Stock Purchase Agreement was entered into. Moreover, the MH LBO-Related Transfer did not even come from the corporation in which MH owned shares, Old Refco; the $4 million came from Old Refco's indirect parent, RGI.

Accordingly, the Trustee's fraudulent transfer claim should be dismissed.

**The Trustee's Unjust Enrichment Claim**

The Trustee's unjust enrichment claim also should be dismissed. First, the MH LBO-Related Transfer was made pursuant to the SPA, and New York law precludes recovery under unjust enrichment or other quasi contract theories when the subject matter of the dispute is governed by a valid and enforceable contract. Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 587 (2d Cir. 2006) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987)); Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572 (2005). Second, as discussed above, RGI's obligation under SPA ¶ 1(c) was lawful and not subject to recharacterization as equity; thus, there was nothing inequitable about RGI's paying it. See City of Syracuse v.

---

[13] "Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of a corporation given it as consideration for its acquisition by purchase, redemption or exchange of its shares of stock if at the time such note, debenture or obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired." 8 DEL. CODE § 160(a)(1) (2011).

<u>R.A.C. Holding, Inc.</u>, 258 A.D.2d 905, 906, 685 N.Y.S2d 381 (4th Dep't 1999) (the "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another"); <u>see also</u> <u>Beth Isr. Med. Ctr.</u>, 448 F.3d at 586 ("To prevail on a claim for unjust enrichment in New York a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.")  Because the MH LBO-Related Transfer was made for fair consideration, it cannot be said to have been made at the expense of RGI or its creditors.

## <u>Conclusion</u>

For the foregoing reasons, MH's motion to dismiss should be granted in full and judgment will be entered dismissing the Trustee's claims against MH.  MH shall submit an order and judgment in accordance with this Memorandum of Decision, which shall state that it is a final judgment, provided that if an appellate court concludes otherwise it shall constitute this Court's conclusions of law and recommendation.

Dated:  White Plains, New York
          November 30, 2011

                              /s/Robert D. Drain
                              United States Bankruptcy Judge